# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

AMERICAN EAGLE OUTFITTERS, INC. and )
RETAIL ROYALTY COMPANY, )
                         )
         Plaintiffs, )
                         )
     vs. )      Case No. 2:06-cv-00607-ARH
                         )
LYLE & SCOTT LIMITED and HARRIS )
WATSON INVESTMENT LIMITED, )
                         )
         Defendants. )

## <u>OPINION</u>

HAY, Magistrate Judge

        According to the Plaintiffs, the Motion for Summary Judgment (Doc. 202) pending in

this fiercely fought and protracted trademark litigation requires the Court to decide "a simple

contract issue" where the "applicable facts are not in dispute" and "[t]he law is straightforward."

(Doc. 203 at 1-2). Given the tortuous - and torturous - nature of the proceedings to date, the

Court, when first presented with this outline of its task, was skeptical. A thorough review of the

parties' memoranda, hundreds of pages of argument-filled "concise" statements of uncontested

fact, supporting appendices, and the law, has, however, convinced the Court that the Plaintiffs

were correct; the critical facts are undisputed[1] and resolution of this matter turns on basic

---

[1] One of the reasons that the Court was skeptical as to the Plaintiffs' outline of the task is that, typically, in contract cases involving issues of this magnitude and potential complexity, there are genuine issues of material fact that must be resolved by a jury. The Court is acutely aware that some of this issues raised in this case are rarely appropriate for disposition by the Court. That said, the Court has given careful attention to every one of the parties' record references, and has dug into and sifted the record multiple times. This review has convinced the Court that the many arguments made by the

contract principles. Relying on these facts and the law, the Court will grant the Plaintiffs'

Motion for Summary Judgment.

## I. **BACKGROUND**

In Counts I and II[2] of the Second Amended Complaint, (Doc. 99), the Plaintiffs, U.S.

companies, American Eagle Outfitters, Inc. ("AE"), a clothing retailer with operations in all fifty

states, the District of Columbia, and Puerto Rico, and internet sales in at least twenty-four foreign

countries, and its wholly - owned subsidiary, Retail Royalty Co. ("RRC"), the owner and licensor

of AE's intellectual property rights, seek a "Declaratory Judgment of Enforceable Agreement"

and specific performance of that agreement against Defendants, Lyle & Scott, Ltd. ("L&S"), a

U.K. sportswear manufacturer, and Harris Watson Investments Limited ("HW") - now known as

Waterlinks Investment Limited - a holding and parent company of L&S, whose principals are

Sue Watson ("Watson") and John Harris ("Harris"). (Id.; Doc. 29). The Plaintiffs' Motion for

Summary Judgment is confined to these counts. Recognizing that its disposition of the pending

Motion is fact-dependent, the Court recounts the facts in detail, viewing as it must, all evidence

and drawing all inferences in the light most favorable to the Defendants.

This dispute originated on September 30, 2005, when Benjamin Sharpe ("Sharpe"), then

Managing Director of L&S, wrote to AE's CEO, James O'Donnell ("O'Donnell"), stating that

---

Defendants - though some are superficially appealing - simply do not comport with the record. For this reason, the Court is confident that no reasonable jury relying on the evidence could resolve these issues in favor of the Defendants.

[2] The grant of summary judgment obviates the need to consider the remaining counts of the Second Amended Complaint which include requests for declaratory judgment on the issue of noninfringement, cancellation of L&S marks, and a claim of trademark infringement. The ruling also eliminates the need to address the trademark issues raised in the Defendants' Answer to the Amended Complaint, (Doc. 45), and in their Motion to Dismiss Counts IV and V of the Second Amended Complaint (Doc. 235).

L&S had recently learned that AE was marketing clothing bearing an eagle logo. (Doc. 223 at 36-37). Sharpe informed O'Donnell that L&S had registered various versions of the "birdie" trademark, writing, "the appearance of your logo is so close to our own registered marks that there is a substantial risk of confusion as to the origin of your goods when offered for sale in Europe . . . [W]e would undoubtedly succeed in infringement proceedings against you." (Id. at 37). Sharpe asked AE to respond with proposals as to "a possible way forward." (Id.)

Near the end of 2005, Sharpe, who testified at his deposition that he was responsible for all of the L&S operation at the time, (id. at 182), asked Dennis Hall ("Hall"), HW's Corporate Development Director, to manage the day-to-day handling of the AE matter "in the best interest of the company." (Id. at 188, 159). Sharpe testified that he did not direct Hall to report to him, or know if Hall was required to report to anyone else. (Doc. 227 Ex. A at 54-56, 151-52). Although the AE matter was an important one, Sharpe delegated it to Hall because Sharpe had more important things to do, and Hall was an able person. (Doc. 223 at 191). Hall did not need Sharpe's prior approval for any aspect of the AE assignment. (Id. at 188). Sharpe had delegated to Hall other trademark matters to that were successfully settled, with Hall signing documents binding L&S. (Id. at 210-214). These other matters were less complicated, with less money at stake. Following Hall's assumption of responsibility for the AE matter, he was the sole L&S participant in telephone conferences and the exchange of correspondence with AE. (Id. at 45-55).

On December 21, 2005, Kimberly Strohm ("Strohm"), Pennsylvania-based in house counsel for AE, emailed Hall noting the parties' common "desire to find an acceptable business solution," and suggesting a "business person to business person meeting with the trademark

advisors available for consultation if necessary." (Id. at 56). Strohm proposed that the meeting

take place in London and that she attend as part of the AE "management team." (Id.). The

meeting was scheduled for January 9, 2006.

Strohm advised Hall that she would be accompanied by Christopher Fiore ("Fiore"), AE's

"Senior Vice President of International," and that counsel for AE would be available for

consultation, but would not attend the meeting. (Id.) She made explicit her understanding that

L&S would "attend with [its] attorneys on a similar basis." (Id.) This email bore a notation, as

had all of the preceding correspondence between Hall and Strohm, establishing that the

communications were "without prejudice," and set the same condition for the proposed

meeting.

Strohm, Fiore and Hall met in London on January 9, 2006, as planned. The meeting

lasted several hours, with the time divided into morning and afternoon sessions. In the morning

session, the parties exchanged background information regarding the nature and scope of their

respective businesses, and AE's use of the eagle logo. (Id. at 249-250). Hall attempted to

persuade AE to "move away" from use of their logo, but AE declined. (Id. at 251). Instead, AE

proposed a coexistence agreement that would involve "two brands using a similar logo in the

same territory" with safeguards in place to avoid consumer confusion. ( Id.).

Hall made handwritten notes in preparation for the meeting, and of what transpired in the

morning session. (Doc. 227 Ex. B at 25-35). At the lunch break, he made additional notes in

preparation for a telephone call to Harris. At his deposition, Hall, with a copy of his notes in

front of him, testified that when he communicated with Harris during the break, he told him that

L&S "had two options, one was to settle, or one was to fight, but that if [they] fought, that what

[they] could potentially win with regard to the U.K. was only about [£15,000], and was uncertain as to an amount in the United States . . . ." ( Doc 227 Ex. B. at 240).  Hall believed at the time that whether L&S could successfully challenge American Eagle for infringing its "trademark positions in the U.S. was not categoric and was not definite in terms of the result [they] would get out of it."  (Id. at 241).

Harris responded that he wanted to think about the matter, and consult with Watson. (Id. at 243).  Before discussions with AE resumed, Harris and Hall spoke again, with Hall making notes that read: "If can settle at greater than or equal to £250,000 - settle and take it." (Doc. 223 at 536).  The notes also contain the phrases "SMW [Susan M. Watson] - prevent golf capsule" and "(Just to be clear . . . accept co-existence if pay £1/4 m . . . yes)."  (Id.).  Hall testified that he recorded this last bit in his notes because he "thought it was a matter of some significance, and  . . . wanted to be clear on where [Harris's] thinking was on it."  (Doc. 227  Ex. B at 243).  After speaking with Harris, Hall made notes captioned  "Negotiating Pts."  (Doc. 223 at 536).  Under this heading, he wrote, among other things, "£½ m - $1m call it!"  (Id.)

 Discussions between AE and L&S reconvened in the afternoon with both Strohm and Hall taking notes.  At the end of the meeting, Strohm and Hall drew up an informal document ("the London Memorandum" or "the Memorandum"), which the Plaintiffs allege was handwritten by Strom in Hall's presence with his input.  (Doc. 223 at 256).  Hall acknowledged that he was the one to suggest that the points upon which the parties had agreed be committed to writing. (Id. at 538).  The Memorandum read:

> AE to pay $1,000,000 (US) to Lyle & Scott.
> Parties agree as follows:

- AE to use its current eagle on American Eagle
  branded merchandise, products must also bear
  American Eagle or American Eagle Outfitters
  on the label;

- AE to sell products in AE stores, stores within
  stores or AE website;

- LS to use its eagle designs on Lyle & Scott
  branded merchandise, products must also bear
  Lyle & Scott on the label;

- perpetual and worldwide pertaining to goods of
  LS registrations;

- AE shall have the right of first refusal to purchase
  LS eagle(s) or business

- Each party shall consent to the registration of the
  other's eagles and AE shall withdraw its opposition
  against LS application in the US.

- Each side to bear their own government taxes

- AE to pay the reasonable + customary atty fees of LS

- AE will not launch or offer a specific range targeted
  at the golf market

- AE will discuss with LS [sourcing of] garments

(Doc. 223 at 64-65) (punctuation in original). Hall asked if he should sign the Memorandum, but Strohm advised that this was not necessary. (Id. at 200). Both Strohm and Hall took copies of the Memorandum with them, and Strohm agreed that she would prepare a formal document, and send it to L&S within two weeks. (Id. at 200, 201).

At the end of the meeting, Hall was satisfied that the Memorandum "fairly captured the day's discussions." (Id. at 256). In his deposition, he stated that he viewed the document as "a

list of points which [was] a summary of a discussion between [sic] [Hall] , Strohm and Fiore . . .

." (Doc. 227 Ex. C at 263). Although he never brought this point to the attention of AE, Hall

testified that he had understood that "Harris and Watson would have a right of veto and would

be required to sign any ultimate document." Id.

At his deposition, Fiore testified that before the conclusion of the meeting, he checked

with O'Donnell about what had been discussed, and that Hall told him that he, too, had to check

with his superiors. At the end of the meeting, Fiore understood that an agreement had been

reached. (Doc. 227 Ex. K at 135, 139). He said something to Hall on the order of "we have a

deal," and, in Fiore's mind, this agreement was binding. (Id. at 133,138). Strohm's testimony

was similar. (Doc. 223. at 200). In its Answers to Interrogatories, AE stated that at the end of

the meeting, Fiore and Hall "shook hands to indicate an agreement." (Id. at 144). It is

undisputed that those attending the meeting did not specifically address whether the

Memorandum was "without prejudice" and did not place a "without prejudice" notation on the

document.

On January 23, 2006, Strohm sent a "draft of the co-existence agreement" comprising

nine pages to Hall for review. (Doc. 223 at 66). Three days later, Hall sent a response to

Strohm, attaching a redlined version of the agreement, observing that he "believe[d]" that his

comments were "simple tidying." (Id. at 78). His only substantive[3] comment related to clause

3(a)( iv), which read, "AEO can register its AEO Eagle Design marks for all goods and services

_____

[3] Hall also referenced language in clause 3(a)(ii) which permitted AEO "to sell off unsold
inventory of products bearing the AEO Eagle Design to third parties." (Doc. 223 at 71). He expressed
concern that this clause gave AE "the ability to circumvent this agreement entirely by classifying product
as unsold inventory." (Id. at 78.) He suggested that this issue be addressed by a "permission caveat" or
other language that AE might propose. Id.

throughout the world." (<u>Id</u>. at 71). Hall explained:

> [W]e do not want to allow you to register outside your core market.
> Naturally we will not object to your internet selling activities and
> we will defend our mark (and by similarity your mark) in these
> other territories. This allows you to trade unfettered whilst not
> diminishing our prior rights in these other territories.

(<u>Id</u>.).

The Plaintiffs characterize this as a "minor change," as it did not eliminate or impede AE's right to register its mark in the United States, to sell over the internet, or to trade outside the United States. (Doc. 221 at 9). Hall's email did not suggest that the formal document failed to incorporate or accurately reflect any of the bulleted points set out in the London Memorandum.

The Plaintiffs allege that before AE could respond to this non-material change regarding its right to register its marks outside the United States, L&S "breached the January 9 agreement as memorialized in the January 23 Formal Document." (<u>Id</u>.). AE contends that this breach occurred after Hall met with Harris and Watson and they began to second guess the deal. Hall's notes confirm that on January 26, 2006, he met with Harris and Watson and was asked, "What have we agreed/ what do they think we agreed." (Doc. 223 at 537). In notes taken during that meeting, Hall also wrote, "Do not want them to register outside far east," and "Do not want them to trade E.U. /Far east via net." <u>Id</u>.

On January 31, 2006, Strohm and Hall exchanged email, discussing Strohm's concerns, which focused primarily on AE's registration rights. It was agreed that Fiore, Strohm and Hall would participate in a conference call the next morning. (<u>Id</u>. at 91). Late in the day before the call, Hall emailed Strohm, stating:

> I need to clarify one issue ahead of our conversation tomorrow

which is now even broader than 3(a) (iv). As a result you may well
think I am moving our position!

After discussions on our licencee relationships, *we now have
significant issues* in allowing you to trade into territories outside
America. This is particularly important in Europe and the Far East
where we have clearly established marks and prior rights. The issue
is that years/decades of building the brand by us and our licencees [sic]
will then enable you to trade off of the eagle logo. The potential
for confusion is not the concern, simply the economic advantage
you may gain from using the logo we and our licencees [sic] have
spent much time/effort/money establishing.

(Id. at 90) (emphasis added).  Hall offered two proposals.  One was that AEO not use the colors

gold or silver for its logo, and not use sewn-on as opposed to embroidered eagles.  The second

was that AE pay a royalty fee of five per cent on all sales made in territories outside the United

States where L&S held established marks.  (Id.)  Hall also wrote:

In the absence of this, we will struggle to justify to our licencees [sic]
any action other than seeking to preserve our registrations and
rights where they exist. I understand that such action will inevitably
result in withdrawal of your proposed US CoExistence.

I appreciate this contradicts the worldwide basis you sought to
achieve at our meeting, though at this time I did explain our licencee
income risks and this issue has subsequently become more
apparent.

(Id.)  Further telephone discussions directed at settlement were unavailing.

On February 10, 2006, Hall emailed Strom in order to clarify the L&S position.

According to Hall, L&S was prepared to co-exist with AE in the United States and to agree to

mutual logo registration there; both parties would be able to trade on the internet, though AE

would not be permitted to use its logo outside the United States in areas where L&S had

established prior rights.  Hall summarized the L&S position as follows:

> None of [this] contradicts our meeting in London (though you have
> interpreted mutual consent to register/withdrawal of your opposition
> in the US as a world-wide right to register - this was not agreed nor
> was it the intention as detailed in my e-mail . . . of 27th January
> commenting on your draft document).
>
> In short, we are prepared to move forward on the basis of our
> London meeting, this being as per your draft Co-existence Agreement
> corrected to acknowledge that your registration will be limited
> to the US and territories where L&S do [sic] not have prior rights.

 (Doc. 227  Ex. FF at 242).   In support of his interpretation of what had been agreed to in
London,

Hall wrote:

> Throughout the meeting we were talking about trading rights - at
> no stage did we discuss [AE] registering outside the US!
>
> *When we came to an agreement and you were proposing to revert*
> *subsequently with outline terms, I suggested we set them out in*
> *writing then and there*. On Clause 6, I meant/understood that
> "Each party shall consent to the registration of the other's eagle
>  . . . . . . [sic] in the US" as it says.

(Doc. 223 at 538) (emphasis added).

Strohm responded that the London Memorandum  had "no geographical limitation as to

registration," (Doc. 227 Ex. FF at 241), but that AE was willing to work to reach a solution with

respect to this issue. She agreed to a New York meeting with Watson.  (Id.).  This meeting did

not take place, although through mid-February the parties continued to correspond in an attempt

to resolve the question of where outside the United States AE would be permitted to register.  As

late as February 17, 2006, L&S continued to reassure AE that its ability to trade world-wide

would be protected:

> What I am thinking is that it might be cleaner if:
> - in the Americas we both register, yes

-elsewhere where we are registered we will register Version E ('your' Eagle) for
your exclusive use, and
- in countries where we are not registered then either of us may register. I
don't have a sample of E - is this good with you?

(Doc. 227 Ex. FF at unnumbered page following p. 326, marked Fiore Dep. Ex. 22).

On March 3, 2006, Hall sent another email to Strohm, stating that he had consulted with
L&S's attorneys on issues regarding internet trading, and, as a result of those consultations, L&S
had again changed its position. Although coexistence and mutual logo registration in the United
States were still acceptable, L&S refused to acquiesce to AE's registration in areas outside the
United States where L&S had established prior rights, and stated that it would now oppose AE
internet *sales* in any areas where L&S had prior rights. L&S also advised that should AE attempt
to trade in those areas, it would take action against AE for trademark infringement. ( Id. at 260-
61). Hall suggested a meeting in the U.S. to discuss these issues.

Strohm responded via email on March 13, 2006, telling Hall that AE was convinced that
the proposed meeting would be unproductive:

> During our meeting in London, we reached an agreement
> ("London Agreement") on the various points at issue. At your
> specific request, we prepared a list of the key terms prior to
> the end of out meeting and you were given a copy. . . If we
> understand your March 3 email, you are now attempting to
> dramatically and materially change the terms of the London
> Agreement; indeed, your proposal virtually emasculates it.

(Id. at 259).

Shortly thereafter, the parties ceased communication, and this suit was filed.

## II.   STANDARD OF REVIEW

Summary Judgment is appropriate only where there are no genuine issues of material fact.

Matsushita Elec. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  An issue of material fact is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In other words, if the evidence, however, is "'merely colorable' or is 'not significantly probative,'" summary judgment may, nonetheless, be granted.  Equimark Commercial Fin. Co. v. C.I.T. Fin. Serv. Corp., 812 F.2d 141, 144 (3d Cir.1987) (quoting Anderson, 477 U.S. at 249-50).

In evaluating the evidence, the court must view the facts and the inferences to be drawn therefrom in a light most favorable to the non-moving party.  Anderson, 477 U.S. at 255.  The burden of establishing that no genuine issue of material fact exists rests with the movant.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial.  See Anderson, 477 U.S. at 249.  When examining the record before it to see if there are any genuine issues of material fact, the court's focus is on issue-finding, not on issue-resolution.  With this standard in mind, the Court turns to the record.

## III.    THE LEGAL SIGNIFICANCE OF THE LONDON MEMORANDUM

### A.  The Elements of a Binding Agreement

While the Plaintiffs contend that the London Memorandum sets out the material terms of a binding agreement, was a collaborative effort resulting from and manifesting the parties' intent to be bound, and was supported by valid consideration, the Defendants take a contrary view, contending that the London Memorandum was nothing more than a preliminary step in the parties' attempt to negotiate around looming trademark litigation.

The burden is on the plaintiff to prove the existence of a contract by a preponderance of the evidence. Viso v.Werner, 369 A.2d 1185, 1187 (Pa.1977) ( citing Geyer v. Huntingdon County Agric. Ass'n, 66 A.2d 249 (Pa.1949)). This burden of proof consists of three elements: (1) the parties' manifestation of intent to be bound; (2) sufficiently definite terms; and (3) consideration. Johnston the Florist, Inc. v. Tedco Constr. Corp., 657 A.2d 511, 516 ( Pa. Super.1995). The Court concludes that the Plaintiffs have met their burden of proof. In order to explain this conclusion, we turn to the record and the parties' arguments, addressing first whether the record shows that there is a genuine question of material fact regarding the parties' intent to form a contract.

## 1. **Contractual Intent**

The Court of Appeals for the Third Circuit has held that in diversity matters, state law governs whether a question is one of law or fact. See Channel Home Ctr, Div. of Grace Retail Corp. v. Grossman, 795 F.2d 291, 300 n.9 (3d Cir.1986) (applying Pa. law). In Pennsylvania, *where there is conflicting evidence* as to whether the parties manifested the intent that a particular writing constitute a binding agreement, resolution of the question is one for the fact finder. Field v. Golden Triangle Broad, Inc., 305 A.2d 689, 691 ( Pa.1973). See also Associated Hardware Supply Co. v. Big Wheel Distrib.Co., 355 F.2d 114 (3d Cir. 1966); Stocktrans, Inc. v. Rostrolder, No. 07-1339, 2007 WL 2317403, at *5 (E.D. Pa. Aug. 7, 2007) (citing Ingrassia Const. Co., Inc. v. Walsh, 486 A.2d 478, 482 (Pa. Super. 1984)); Johnston the Florist, 657 A.2d at 516. "In this respect, Pennsylvania law is consistent with the law applicable in most jurisdictions." Adani Exports Ltd. v. AMCI Export Corp., Civ. No. 05-304, 2007 WL 4298525, at *12 (W.D. Pa. Dec. 4, 2007) (citations omitted).

The intent of the parties to enter into a contract is ascertained with reference to "their *outward and objective manifestations of assent*, rather than their undisclosed and subjective intentions." Long v. Brown, 582 A.2d 359 (Pa. Super. 1990) (quoting Ingrassia Constr. Co., Inc., 486 A.2d at 483). Thus, a party's subjective perception of the legal consequences of a document or an agreement does not preclude contract formation. "[A] party may be bound by his words or conduct, without any intention to assume legal obligation if the words or conduct are such that a reasonable man of ordinary carefulness and intelligence would understand that such was his intention." Gallo v. Howard Stores Corp., 145 F. Supp. 909, 912 (E.D. Pa.1956). In assessing the evidence as to the parties' manifested intent to be bound, the Court looks to the surrounding circumstances, the situation of the parties, the objects they apparently had in view, and the nature of the subject matter of the agreement. Darlington v. Gen. Elec., 504 A.2d 306, 311 (Pa. Super. 1986) (citations omitted) overruled on other grounds by Krajsa v. Keypunch, Inc., 622 A.2d 355 (Pa. Super.1993) .[4]

---

[4] The parties have not cited, and the Court has not found a case in which the Supreme Court of Pennsylvania or the Court of Appeals for the Third Circuit enunciates the factors that may be considered in determining whether parties to an alleged oral agreement or informal written agreement intended to enter into a binding contract. A substantial body of case law applicable to both oral and informal agreements has, however, been developed by the Court of Appeals for the Second Circuit. Federal courts construing Pennsylvania law have looked to decisions of that Court for guidance. In deciding Provident Am. Corp. v. Loewen Group Inc., Civ. No. 92-1964, 1995 WL 105483 (E.D. Pa. March 10, 1995), for example, the District Court listed the following four non-exclusive factors considered by the courts in the Second Circuit evaluating contractual intent: (1) a party's explicit statement that it reserves the right to be bound only when a written agreement is signed; (2) whether one party has partially performed and that performance has been accepted by the party disclaiming the contract; (3) the existence of open terms; and (4) whether the agreement involved a scale of investment and complexity such that a writing requirement would be expected. Id. at *6 (collecting cases from the Court of Appeals for the Second Circuit).

Scholars and other courts have considered an even wider array of factors. See Restatement (Second) Contracts § 27 cmt. c (1981); 1 Samuel Williston, A Treatise on the Law of Contracts § 4:8 at 302-12 (Richard A. Lord ed., 4th ed. 1990); see also Philips Credit Corp. v. Regent Health Group, Inc., 953 F. Supp. 482 (S.D.N.Y. 1997) (listing the following sixteen factors: (1) number of terms agreed upon compared to total number to be included; (2) parties' relationship; (3) degree of formality used in similar

The Court has dissected the record evidence bearing on the parties' manifestations of assent with respect to the terms of the London Memorandum and is convinced that there is no genuine question of material fact with respect to contractual intent. Even viewed in the light most favorable to the Defendants, the evidence and all reasonable inferences to be drawn therefrom demonstrate that each person at the January 9, 2006 meeting - whatever his or her subjective beliefs about the legal import of the Memorandum - manifested to the others, both at and after the meeting, that agreement had been reached. The Defendants' arguments to the contrary, though forcefully stated, are not supported by the record. The Court considers these arguments seriatim.

### a. Contemplation of a Formal Agreement

The Defendants argue first that those attending the London Meeting expressed the intent "not to be bound until a formal written agreement had been executed by the [parties' principals]". (Doc. 225 at 13). The record belies this argument. The evidence does not show that any of the parties addressed or manifested in any way an understanding that they would not be bound by the terms of the London Memorandum. In fact, the manifestations of the parties, as detailed in the factual summary set out above, demonstrate that the parties were confident at the end of the

---

contracts; (4) whether partial performance was accepted by other party; (5) industry usage and custom; (6) parties' subsequent conduct and interpretation; (7) whether writing is contemplated merely as memorial; (8) whether contract needs formal writing for its full expression; (9) whether terms remain to be negotiated; (10) whether contract has few or many details; (11) whether amount involved is large or small; (12) whether standard form is widely used in similar transactions or whether contract is unusual; (13) speed with which transaction must be concluded; (14) simplicity or complexity of transaction; (15) availability of information necessary to decide whether to enter into contract; and (16) time when contract was entered into.). No single factor is decisive.

meeting that terms had been reached, and that these terms would be incorporated in a more formal, executable document. If any of those attending the meeting thought something different, that thought was not expressed orally, in the participants' meeting notes, in their conduct, or in the London Memorandum itself. Hall admitted as much in his deposition testimony. (Doc. 223 at 268-69).

The record does establish that the parties did not intend that the London Memorandum be the final embodiment of their agreement. At the same time, the facts show that the parties manifested in their actions, notes and speech that the critical material terms of the agreement had been settled, and would form the crux of a formal contract. In these circumstances, that anticipation of a formal agreement is not fatal to contractual intent.

Under Pennsylvania law, a voluntary agreement binds the parties "whether or not [it was] made in the presence of the court, and even in the absence of a writing." Max Control Sys., Inc., v. Ind. Sys., Inc., No. 99-CV-2175, 2001 WL 1160760, at *2 (E.D. Pa. July 31, 2001) (citing Green v. John H. Lewis & Co., 436 F. 2d 389, 390 (3d Cir. 1970)). Where the parties agree upon the essential terms and manifest an intention to be bound by them, "'a contract is formed *even though they intend to adopt a formal document with additional terms at a later date.*'" Stocktrans, 2007 WL 2317403, at *4 (quoting Courier Times, Inc, v. United Feature Synd., Inc., 445 A.2d 1288, 1295 (Pa. Super. 1982) (emphasis added)). See also Field v. Golden Triangle Broad., Inc., 305 A.2d at 369; In re ABC-Federal Oil & Burner, Co., 290 F.2d 886 (3d Cir. 1961). As long as the parties have agreed on the essential terms of a contract, it does not matter whether those terms have been reduced to writing, or that the parties have tried and failed multiple times to do so. Id. Thus, in Woodbridge v. Hall, 76 A.2d 205 (Pa. 1950), the Supreme

Court of Pennsylvania found a binding contract where each material term was covered by an oral agreement, even though the parties, after three drafts, were unable put the settlement in writing.

Similarly, the lack of or expectation of signatures is not dispositive evidence of contractual intent. "As a general rule, signatures are not required for a binding contract unless such signing is expressly required by law or by the intent of the parties." Commerce Bank/Pa. v. First Union Nat. Bank, 911 A.2d 133, 145-46 (Pa.Super. 2006) (quoting Shovel Transfer & Storage, Inc. v. Pa Liquor Control Bd., 739 A.2d 133, 136 (1999)). The record does not reveal that any of the participants at the London meeting communicated that signatures were a condition of settlement on the terms set out in the London Memorandum. Most significantly, Hall offered and was prepared to sign the Memorandum himself. The record indicates that this was the procedure that he had adopted in the past when handling trademark matters on behalf of L&S. (Doc. 227 Ex. B at 29-30).

### b. The preparation of a draft agreement

The Defendants argue next that preparation of the formal draft agreement contradicts the Plaintiffs' contention that a binding agreement had already been reached: "Consistent with the understanding at the London Meeting that any agreement would need to be carefully reviewed by counsel and principals for the parties and then executed, the Draft Co-existence Agreement indicated that it would be effective only upon execution." (Doc. 225 at 18). The problem with the Defendants' statement is that they fail to cite and the Court has not found even a wisp of evidence in the record to show that there was such an understanding.

"[I]t is well-settled in Pennsylvania that where the parties have settled upon the essential terms and the only remaining act to be done is the formalization of the agreement, the latter is not

inconsistent with the present contract." <u>Melo-Sonics Corp. v. Cropp</u>, 342 F.2d 856, 859-60 (3rd.Cir.1965); <u>Field</u>, 305 A.2d at 689.  The record here will not support anything other than a reasonable inference that by the time the London meeting had concluded, "the core terms of the deal [were] already 'final' and that only the (non-material) fine points remained to be 'finalized.'" <u>Browne v. Maxfield</u>, 663 F. Supp. 1193, 1198 (E.D. Pa. 1987).

Fiore, Strohm and Hall attended the London meeting to effect a business - as opposed to a legal - solution to a conflict that threatened to be costly to both AE and L&S.  The record establishes that the terms reached were approved  by the parties' respective counsel or principals before the conclusion of the London meeting, and that when the meeting ended, the participants understood that they had arrived at the essential terms of an agreement.  What Fiore, Strohm and Hall manifested to each other when the Memorandum was being drafted, when the meeting was over and in the weeks following the meeting, was that the essential and material terms of the deal had been struck.  What remained to be added was detail, and nothing said or done by anyone at the meeting hinted that enforceability of the core deal was contingent on preparation of a formal document, or on execution of that document.  "In order to counter that conclusion, it must be found as a fact that at least one of the parties has expressed the intention not to be bound until the [formal] writing [is] executed."  1 Williston on Contracts § 4:11 (4th ed. 2008).

 The Defendants' allegation that those at the meeting understood that the Memorandum was not binding - without any citation to the record evidence - is insufficient to establish a genuine issue of material fact for purposes of summary judgment.  <u>Connors v. Fawn Mining Corp</u>., 30 F.3d 483, 489 (3d Cir.1994).  While the London Memorandum certainly lacks the formality one normally associates with a contract for so significant a venture, and it was expected

that a more formal document would be drafted, there is no evidence in the record that the parties said or otherwise indicated that the Memorandum was not binding absent the drafting or execution of a formal document.

### c. **Content of the draft agreement**

The Defendants argue next that the "many and profound" differences in the terms of the formal agreement and those in the London Memorandum evidence the non-binding nature of the Memorandum. (Doc. 225 at 20). They point out that the draft contains: a mutual release, a termination clause, a choice of law provision, assignment rights, and the inclusion of RRC as owner of the AE trademark, as a party. (Id. at 18).[5] The Defendants do not identify which of these additional terms might be deemed "essential" or "material." These differences amount to standard contract boilerplate, and are exactly the sort of provisions that one would expect to be added to the core terms of an agreement made by sophisticated businesses. As the exchange of correspondence between AE and L&S immediately after the London meeting makes clear, these additional clauses did not alter the essential material terms which Strohm and Hall cooperatively drafted at the London meeting. Each of the London Memorandum terms was incorporated in the Draft Agreement, and the obligations of the parties - as contemplated by the informal agreement - were unchanged by the terms of the Draft.

That the additional terms cited by the Defendants were the flesh on the body of a core

---

[5]  The Defendants also contend in their Memorandum in Opposition to Summary Judgment, and in their Additional Statement of Material Facts, that the draft agreement contained a provision permitting AE to open retail stores worldwide. (Doc. 225 at 18, Doc. 226 at 77). The Defendants do not provide a record reference supporting this assertion, and no such provision appears in the draft agreement included in the record. See (Doc. 223 at 67). Significantly, Hall, in communicating with AE after receiving the draft agreement, did not object to or mention expansion of the AE retail operation.

agreement is confirmed by email exchanged by the parties shortly after the London meeting. At the meeting, Strohm agreed to have a formal draft agreement to Hall by January 23, 2006. Hall received this draft on the date specified, and made comments specifically assuring Strom that the comments were "mostly tidying." Hall described this change as "minor," writing, "We do not want to allow you to register outside your core market." (Doc. 223 at 71). Hall then reiterated that the registration issue did *not* jeopardized the co-existence agreement. Although AE preferred to register its marks, and was interested in continuing to discuss the scope of its registration rights, it, too, viewed this issue as "significant" but not "material." (Doc. 221 at 9). Hall did not object to the inclusion or accuracy of any of the other terms set out in the draft agreement, including those referencing "extensive discussions in a meeting, and in prior and subsequent exchange of correspondence with respect to [coexistence]." (Doc. 223 at 69).

The Court does not find and the Defendants do not identify any aspect of the draft agreement that undermines the existence or enforceability of the terms included in the London Memorandum. The Court finds that the draft agreement and, for that matter, the entirety of the parties' communications following receipt of the draft agreement, is consistent with the fact that an accord was reached at the London meeting - an accord which gave AE the right to trade internationally without trademark repercussions from L&S.

### d. Significance of the term "without prejudice"

The Defendants contend that the use of the term "without prejudice" in the communications preceding the London Meeting and in the ground rules for that meeting itself is dispositive evidence that the parties could not have intended to be bound by anything that transpired at that meeting. According to the Defendants, use of the term "without prejudice" as a

ground rule precluded the possibility that a binding settlement could have been reached at that meeting. AE takes a narrower view, arguing that the purpose of the London meeting was to reach a settlement, and that the term "without prejudice" meant only that the parties could not use information disclosed during that meeting to the other's detriment outside the context of settlement negotiations. Although the parties state different views of the breadth of the term, the record demonstrates that participants in the London meeting shared essentially the same understanding of the phrase - that nothing written in the documents bearing the "without prejudice" notation or said during a discussion held under the "without prejudice" proviso could be used to the detriment of the drafter or the speaker.[6] They used that phrase in the correspondence leading up to the London meeting, and used the phrase as a ground rule for the meeting. The phrase was not, however, placed on the Memorandum itself, nor was it used in email exchanged by Hall and Strohm in connection with the draft agreement. Hall did not resume using the "without prejudice" notation in communication with Strohm until January 31, 2006. (Doc. 223 at 90).

The law does not support the Defendants' position that a binding settlement may not be reached in settlement negotiations held without prejudice. A review of pertinent legal authority shows that the phrase "without prejudice" is a legal term of art with its origin in the common law, and is used with some frequency in case law, both in the United Kingdom and the United

---

[6] In deposition, Hall testified that, "in common practice," the term meant "non-binding." (Doc. 223 at 237). "It [covers] the discussions that we're having in total as non-binding." ( Id. at 244). At her deposition, Strohm defined the term to mean "[t]hat the parties could talk openly with each other, and if they made any type of admissions, that those would not be used if this matter went into litigation." (Doc. 227, Ex. H at 196-97). The phrase was used in order to facilitate a free exchange of ideas. (Id). Fiore interpreted the term to mean that "nothing that is discussed at that time will be used against you or is kind of off the record . . . A non-binding communication." (Doc. 227 Ex. K at 86).

States, addressing the admissibility of evidence disclosed in the course of settlement negotiations. See e.g., David Vaver, "Without Prejudice" Communications - Their Admissibility and Effect, 34 U. B.C.L. Rev. 85 (1974) (tracing use of the phrase in U.K. common law). According to Vaver, "historical analysis of the English decisions" explains the evolution of the phrase "without prejudice" in the context of settlement negotiation and the rules of evidence as follows:

> It is considered sound *public policy* that parties to a dispute resolve their differences in a peaceful manner, without being compelled to resort to the expense, delays, inconvenience and hostility engendered by litigation under the adversary system. In attempting to resolve their differences, the parties may well make admissions during negotiations for the purpose of showing their good faith and for smoothing the path to settlement. The difficulties of proving by direct evidence the contents of the admissions may be pointed out and may be an influencing factor towards a compromise. But if such express or implied negotiations fail, no admission made during them may be used in support of the other party's case. To this extent the courts are prepared to suppress truthful "best evidence" since . . .the promotion of peaceful compromises[] is considered to outweigh the . . . possibility of a decision against the realities of the case through an exclusion of an admission.

Id. at 94 (italics in original). The same policy concerns have been articulated repeatedly in U.S. federal case law. In its decision in Stockman v. Oakcrest Dental, 480 F.3d 791 (6th Cir. 2007), for example, the Court of Appeals wrote:

> Parties are unlikely to propose the types of compromises that most effectively lead to settlements unless they are confident that their proposed solutions cannot be used on cross-examination, or under the ruse of "impeachment evidence," by some future [ ] party
> . . . . Parties must be able to make hypothetical

22

> concessions, offer creative *quid pro quos*, and generally
> make statements that would otherwise belie their litigation
> efforts.

Id. at 805.  See also Bank Brussels Lambert v. Chase Manhattan Bank, N.A., Nos. 93 Civ. 5298,

93 Civ. 8270, 1996 WL 71507, at *3 (S.D.N.Y. February 20, 1996) (observing that "[t]he rule . .

. *fosters resolution* of disputes because compromises made during the settlement process will not

later surface to haunt the parties as substantive evidence.") (emphasis added).

Under the common law as it developed in both the United Kingdom and the United

States, however, most courts did not exclude from evidence admissions of fact made by a party

during settlement discussions unless the party explicitly framed the statement as a hypothetical,

invoked the talismanic words "without prejudice" or unless the words constituting the admission

were "so connected with the offer as to be inseparable from it."  Wayne D. Brazil, Protecting the

Confidentiality of Settlement Negotiations, 39 Hastings L. J. 955 (1988) (quoting Fed. R. Evid.

408 advisory committee's note ) (footnote omitted).  The same was true under federal common

law.  See Valerie S. Alabanza,  When are Settlement Communications Protected as "Offers to

Compromise Under Rule 408?" 40 Santa Clara  L. Rev. 547, 549-50 (2000).  In the United

States, the common law approach to statements made during the course of settlement talks was

deemed unsatisfactory in that "it discouraged and hampered freedom of communication between

parties and placed restraints on efforts of settlement negotiation."  Id. at 550.  See also In Interest

of Doe, 900 P. 2d 1332, (Haw. App. 1995).  In order to correct this shortcoming, Fed. R. Evid.

408 expanded the breadth of the common law rule by eliminating the need for hypothetical

questions or the "without prejudice" recitation in settlement talks and documents, and by

extending the inadmissability of evidence disclosed during negotiation to statements of fact.[7]

"Rule 408 was intended to sweep broadly and 'encompass the whole of the settlement evidence.'" <u>Dow Chemical Co. v. U.S.,</u> 250 F. Supp.2d 748, 804 (E.D. Mich. 2003) (<u>quoting Overseas Motors, Inc. v. Import Motors, Ltd., Inc.,</u> 375 F. Supp. 499, 537 (E.D. Mich. 1974), <u>aff'd</u>, 519 F.2d 119 (6th Cir. 1975)).

Although the Court is well aware that the "without prejudice" issue presented by the facts of this case does not turn on application of Rule 408, the Rule and its common law history are relevant. This is because under the common law - both English and federal - use of the words "without prejudice" in the course of settlement talks did not preclude negotiation of a binding settlement agreement. To the contrary, these words - and the policy considerations in which their roots were sunk - were meant to *encourage* contract formation by freeing the parties from

---

[7] This Rule in its entirety, provides as follows:

Rule 408. Compromise and Offers to Compromise

(a) Prohibited uses.- Evidence of the following is not admissible on behalf of any party, when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction:

(1) furnishing or offering or promising to furnish - or accepting or offering or promising to accept - a valuable consideration in compromising or attempting to compromise the claim; and

(2) conduct or statements made in compromise negotiations regarding the claim, except when offered in a criminal case and the negotiations related to a claim by a public office or agency in the exercise of regulatory, investigative, or enforcement authority.

(b) Permitted uses .- This rule does not require exclusion if the evidence is offered for purposes not prohibited by subdivision (a). Examples of permissible purposes include proving a witness's bias or prejudice; negating a contention of undue delay; and proving an effort to obstruct a criminal investigation or prosecution.

28 U.S.C.A.

fear that their words could be used against them if settlement failed and the dispute went to trial. Commenting on the reach of the phrase in the law of the United Kingdom, Vaver writes: "It has always been recognized that once negotiations culminate in agreement, a "without prejudice" stipulation ceases to have any operation so far as the agreement is concerned and the agreement takes effect according to its tenor." 34 U. B. C. L. Rev. at 143 (footnote citing cases omitted). More succinctly, "'without prejudice' ceases to have effect once agreement has been reached . . . ." (Id. at 144).[8]

The result is the same even under the expanded reach of Rule 408. Even as it was amended in 2006, Rule 408 bars compromise evidence only when it is "offered as evidence of the 'validity,' 'invalidity,' or 'amount' of the disputed claim. The intent [was] to retain the extensive case law finding [the Rule] inapplicable when compromise evidence is offered for a purpose other than [those explicitly identified in the language of the Rule]." Rule 408 advisory committee notes to 2006 Amendment. Thus, Rule 408, which in effect codifies and expands the "without prejudice" rule as applied at common law, does not extend to settlement-related evidence that is not connected to the underlying claim - here, the trademark issues - in dispute. See Dow Chemical, 250 F. Supp.2d at 804 (finding that "Rule 408 does not bar evidence of a settlement when offered to prove a breach of the settlement agreement, as the purpose of the evidence is to prove the fact of settlement as opposed to the validity or amount of the underlying claim.") (quoting Rule 408 advisory committee notes to 2006 Amendment; (citing Cates v.

---

[8]  This statement of the law is consistent with general practice in the federal courts. Parties participating in scheduled settlement conferences or  meeting out of court to discuss settlement engage in negotiations to which Federal Rule of Evidence 408 - the embodiment of the "no prejudice" principle - applies. These negotiations often result in enforceable settlement agreements despite the fact that the negotiations themselves took place on a "no prejudice" basis.

Morgan Portable Bldg. Corp., 708 F.2d 683 (7th Cir. 1985)).  For a similar statement of the law,

see Uforma/Shelby Bus. Forms, Inc. v. NLRB, 111 F.3d 1284 (6th Cir. 1997) (Rule 408

inapplicable to claims based on wrong committed during settlement discussions; e.g., libel,

assault, and *breach of contract*; citing 23 Charles Alan Wright & Kenneth W. Graham, Jr.,

Federal Practice and Procedure: Evidence § 5314 (1st ed. 1980) (footnotes omitted) (emphasis

added)).[9]

The Court's analysis does not rest on the assumption that the law necessarily informed

the parties' use of the term "without prejudice."  The bottom line in the Court's Rule 408

discussion and the correlate analysis of the English and federal common law term "without

prejudice" is this: the phrase "without prejudice" as used originally and consistently in the law

invokes an evidentiary exception that favors - and certainly does not preclude - settlement

agreements.  The position taken by the Defendants that the "no prejudice" ground rule set for the

London meeting meant that no binding settlement could be reached defies the law, common

---

[9]  In support of its position, the Plaintiffs cite two decisions which are in accord with the Court's
analysis. See In re Oceanic Ship Scaling Co., 108 F. Supp. 7, 9 n.3 (E.D.N.Y. 1952) ("'Without
prejudice' meant that defendants retained whatever legal rights they had when the offer to compromise
was  made [and] did not mean that  they retained the right to refuse to perform the contract . . . which the
offer contemplated."). The Plaintiffs also direct the Court's attention to a second case, which they cite as
Brown v. Rice and Patel, [2007] EWHC 625 (Ch).  The Court knows nothing about which tribunal
decided this case or the precedential value of the decision.  The Court does note, however, that the
analysis of the "without prejudice rule" and the cases cited in Brown support the court's conclusion with
respect to the "no prejudice" rule in this matter.  The issue in Brown was whether the "without prejudice
rule" applied in mediation proceedings to preclude proof that a settlement agreement was reached.  The
decision maker held that it did not.  Because the "no prejudice rule was held to apply in mediation as
well as in party to party negotiations, the substance of what took place in the mediation could not be
introduced in litigation ensuing as a result of failure to settle the case.  The rule did not, however, prevent
introduction of the same evidence to show that a settlement agreement had, in fact, been reached.  "The
exception to the without prejudice rule where the issue is whether there was a concluded settlement
operates just as much where the without prejudice rule is founded in the parties' agreement as it does
where it is founded on public policy."  Id. at [25].

sense and the facts.  There would have been no point in trying to reach a "business solution" to a

dispute in a meeting where the rules governing the meeting barred any possibility of solution.

The Court also rejects the Defendants' argument that, regardless of the legal meaning of

the term, and regardless of whether the parties were even aware of the term's legal implications,

it was the meeting participants' intent that the phrase "without prejudice" bar the possibility of a

binding settlement.  As has been discussed at length, every scintilla of record evidence bearing

on Hall's conduct before, during, and for weeks after the meeting, establishes that he believed -

and manifested the belief - that settlement could be and was reached during the London

meeting.[10]  This belief was reasonable given the conduct of and instructions given by his

superiors.  Hall's deposition statement - made long after the meeting and in the context of

litigation - that he believed that the Memorandum could not be binding, given the "without

prejudice" terms on which the meeting was held, is inadequate to state a genuine issue of

material fact as to the parties' intent that is sufficient to defeat summary judgment.

           e.  **Hall's Authority**

The Defendants contend that Hall lacked authority, actual or apparent, to enter into a

binding settlement.  They also contend that any issue regarding apparent authority is not

appropriate for resolution at summary judgment, because it depends heavily on issues of fact.

See Great N. Insur. Co. v. ADT Sec. Srvs., Inc., 517 F. Supp.2d 723, 746 (W.D. Pa. 2007).  The

Court rejects both of these contentions.  While it may be true that most cases turning on issues of

---

[10]  The Court need not consider whether its "without prejudice" analysis would have been
different had Hall expressed an understanding of the term that was at variance with the definition
articulated in the law and common practice. The record contains nothing to indicate that Hall
communicated the assumption under which he now claims to have been operating.

apparent authority cannot be decided on summary judgment, this case is the rare one where the general rule does not apply.  "Where the facts relating to the nature and existence of the agency relationship are not contested, the court may properly decide the issue."  Id.

The Defendants' contention that Hall lacked authority to settle this matter is not supported by the record.  In fact, virtually every documented aspect of his interaction with the Plaintiffs supports the proposition that he possessed at least apparent authority - and even actual authority - to negotiate on behalf of his principal, having been charged by his superior with bringing the AE matter to resolution.

The Defendants argue that Hall could not have had authority to enter into any settlement during the London meeting, because that meeting was conducted on a "without prejudice" basis.  "It would be illogical for [AE] to believe that Mr. Hall had either actual or apparent authority to bind his employer at the [London] meeting."  (Doc. 225 at 26).  This argument has been addressed and rejected.

The Defendants also point to deposition testimony by Hall and Harris to the effect that each understood that final approval of any co-existence agreement rested with Harris and Watson.  Harris testified that "Hall lacked authority to agree to anything."  (Doc. 227 Ex. U. at 146).  This argument, too, has been addressed and rejected. What Hall or Harris knew or believed about limits on Hall's authority is irrelevant unless AE knew or had reason to know those limits.

In resolving cases turning on apparent authority, courts in Pennsylvania "adhere to the doctrine of apparent authority as expressed in the Restatements . . .  of Agency."  William B. Tanner Co., Inc., v. WIOO, Inc., 528 F.2d 262, 265 (3d. Cir. 1975).  According to the Restatement, apparent authority is established where there has been a manifestation of an agent's

authority by a principal, and a third party's belief that an agent is authorized is "traceable to [that] manifestation." Restatement (Third) of Agency § 3.03 (2d ed. 2006). See also Chainey v. Street, 523 F.3d 200, 212 (3d Cir. 2008). Thus, an agent may bind his principal to third persons where "his acts are within the scope of the authority which the principal has caused or permitted him to possess." Edwards v. Heralds of Liberty, 107 A. 324, 325 ( Pa.1919).

"Apparent authority can exist only to the extent that it is reasonable for the third party dealing with the agent to believe the agent is authorized." Jones v. ABN AMRO Mortg. Group, Inc., 551 F. Supp.2d 400, 410 (E.D. Pa. 2008) (quoting D & G Equip. Co., Inc. v. First Nat'l Bank of Greencastle, 764 F.2d 950, 954 (3d Cir.1985)). "The test for determining whether an agent possesses apparent authority is whether 'a man of ordinary prudence, diligence and discretion would have a right to believe and would actually believe that the agent possessed the authority he purported to exercise.'" Universal Computer Sys., Inc. v. Med. Svcs. Ass'n of Pa., 628 F.2d 820, 823 (3d Cir.1980) (citation omitted). Comment b to Section 3.03 of the Restatement (Third) of Agency (2006) explains that a principal may manifest an agent's authority to a third party:

> by placing an agent in a defined position in an organization or by placing an agent in charge of a transaction or situation. Third parties who interact with the principal through the agent will naturally and reasonably assume that the agent has authority to do acts consistent with the agent's position or role unless they have notice of facts suggesting that this may not be so. A principal may make an additional manifestation by permitting the agent to serve as the third party's exclusive channel of communication to the principal.

Based on the law and the undisputed evidence of record, the Court has no doubt that Hall had, at a minimum, apparent authority to bind L&S in the negotiations with AE. At his

deposition, Hall described his understanding of the scope of his corporate responsibility as

follows:

> Q. All right. What was the - what was your understanding of the
> scope of your authority in making decisions during the course
> of your employment with Harris Watson?
>
> A. The rules of my employment from my perspective were given
> a relatively free hand to discuss situations and negotiate
> situations on the basis that I had to keep John Harris and Sue
> Watson informed, and if there was anything of major
> substance, then they were ultimately the signatories on it, and
> I had to get their approval to sign off on things.
>
>      *     *     *     *
>
> Q. How was a major decision defined?
>
> A. That's - I don't think we ever defined that, but certainly all
> documentation that required - legal documentation required
> John and Sue to sign it as the signatories of the business.
>
> Q: What do you mean, legal documentation?
>
> A. Again, the definition of that I guess is probably not clear.

(Doc. 223 at 221).

Although the limits of Hall's authority were ill-defined, the record establishes that his

ability to act on behalf of L&S was not, in practice, nearly as narrow as Watson and Harris

describe it in their deposition testimony. In late 2005, Hall, through the Defendants' corporate

chain of authority, was expressly charged by L&S managing director, Sharpe, with resolving the

AE dispute, and was appointed the conduit through which AE interacted with L&S. (Id. 188,

191). Sharpe testified that he remembered delegating trademark disputes to Hall, and that Hall

had settled at least some of these other cases, one via an oral agreement. (Id. at 184). Hall

confirmed that he had negotiated the settlement in three other trademark disputes, and that he had

signed letters containing settlement terms on behalf of L&S. (Id. at 207-216). These were cases where the alleged infringers agreed to abandon use of an eagle logo, and any amount paid to the Defendants was less than the million dollars involved here. Id.

In arguing that Hall lacked authority to settle the dispute between L&S and AE, the Defendants do not even comment on the evidence regarding Sharpe's delegation of authority. The only record reference to this delegation is Watson's startling deposition testimony that Sharpe lacked authority to delegate the AE dispute to Hall because Sharpe's title, "Managing Director" of L&S, was nothing more than a "courtesy title." (Id. at 308). The "courtesy" nature of his job was, however, never communicated to Sharpe. (Id. at 309).[11] Furthermore, Hall's testimony shows that Harris was aware of Hall's role as sole negotiator in the AE matter, and that Harris never objected.

The Defendants also ignore the substance and import of Hall's notes - evidence highly relevant to every issue raised in the context of the pending motion - that he lacked authority to settle with AE. Hall's notes establish that he communicated directly with Harris during a mid-day break in the meeting, recording contemporaneously the terms on which Harris told him to "settle." (Doc. 227 Ex. B. at 240). Hall's notes also reflect that he prepared for the afternoon session with Harris's goals in mind, (Doc. 223 at 536), and that when the meeting continued, Hall negotiated effectively. The session concluded with Hall and Strohm collaborating in the

---

[11] Watson also testified at her deposition that HW had an "open management style" that did not have a formal requirement that Hall or Sharpe report to Watson regarding settlement of any trademark dispute. Managers were expected to report back on an informal basis during management meetings. (See Doc. 227 Ex. R at 167). The limits of authority to settle trademark disputes granted to the managing director were not discussed. Watson expected that the managing director would bring to her attention anything that he deemed important with the business. (Id.). The whole of Watson's deposition testimony paints a picture of a corporate operation with blurred lines of communication and authority.

draft of an informal document which contained the phrase "parties agree as follows."  (Id. at 64-65).  That document contained the terms  authorized by Harris.  (Id.).  Moreover, Hall, acting in conformance with what seems to have been the procedure followed in the other trademark cases that he had handled, *offered to sign* the document.  (Id. at 197).  Every aspect of Hall's actions supports the conclusion that he had, reasonably believed that he had, and conveyed every impression that he had authority to settle the matter with AE.

Sharpe and Harris placed Hall in a position that clearly justified AE's assumption that Hall had settlement authority.[12]  Moreover, the delegation by Sharpe and Hall's mid-meeting calls with Harris provide strong support for the argument that Hall had the *actual* authority to reach a settlement on behalf of the Defendants.  The Defendants have not pointed to a single item in the record that would  have put Strohm or Fiore on notice that Hall lacked the requisite authority.  There is nothing in the record showing that Hall ever mentioned the ultimate veto power of the HW principals, or indicated that their signatures were essential to enforceability of the settlement.

The deposition testimony recording what Hall, Harris and Watson say that they believed about Hall's authority and the legal effect of the London Memorandum, is not sufficient to defeat summary judgment.  This is because the record fails to show that this subjective information was

---

[12]  Comment b to Section 3.03 of the Restatement (Third) reads in relevant part:
> If a principal has given an agent general authority to engage in a class of transactions, subject to limits known only to the agent and the principal, third parties may reasonably believe the agent to be authorized to conduct such transactions and need not inquire into the existence of undisclosed limits on the agent's authority.

ever communicated to Strohm or Fiore or that they had reason to know what was not disclosed. Based on the entirety of the relevant evidence of Hall's authority, the Court does not hesitate to conclude that Hall possessed at least apparent authority to bind L&S, and that no reasonable jury could find otherwise.

### g. **The Lack of Consideration**

Whether a contract is supported by consideration presents a question of law. Pennsy Supply, Inc. v. Am. Ash Recycling Corp. of Pa., 895 A.2d 595, 601 (Pa. Super. 2006). No agreement is enforceable without valid consideration. "Valid 'consideration' confers a benefit upon the promisor or causes a detriment to the promisee and must be an act, forbearance or return promise bargained for and given in exchange for the original promise." Cardamone v. University of Pittsburgh, 384 A.2d 1228, 1232 n.6 ( Pa. Super.1978) (citing Hillcrest Foundation Inc. v. McFeaters, 2 A.2d 775, 778 ( Pa.1938)). Without citing the law or to the record, the Defendants argue that because there was no "meeting of the minds as to the terms of an agreement, it follows that there was never an exchange of consideration."(Doc. 225 at 39). According to the Defendants, there was no "proof that a detriment was incurred by [AE] and that a benefit was received by [L&S] . . . ." Id. This argument ignores the facts and the law.

The Restatement (Second) of Contracts §1 (2008) defines a contract as "a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." The promises made here fall squarely within that definition. The case law also establishes that there is no lack of consideration to support the agreement made between AE and L&S. Consideration is often found in a bilateral exchange of promises. See Universal Computer Systems v. Medical Services Ass'n, 474 F. Supp. 472, 477 (M.D. Pa.1979),

aff'd, 628 F.2d 820 (3d Cir.1980) (defining consideration as "an act, forbearance, or return promise bargained for and given in exchange for the original promise").

There is no credible argument that consideration was lacking here. The record establishes that L&S promised to forego its right to pursue trademark claims against AE, to place its name on the label of items bearing the L&S logo, and to give AE right of first refusal to purchase the L&S eagles or its business. In return, AE agreed to pay L&S $1 million, refrain from selling in the golf market, place its label on goods that it offered for sale, limit its use of an eagle mark to its current eagle, withdraw opposition to L&Ss' application for registration of its mark in the United States, and pay L&S's attorneys fees. (Doc. 223 at 64-65). Under controlling case law, these promises made by and between AE and L&S were more that adequate consideration for the agreement set out in the London Memorandum. The fact that the parties contemplated that the actual payment of funds would be made at a later date, after the formal agreement was finalized, does not negate the value or the enforceability of the promise to pay.

### 2. Definiteness of the Contract Terms

One of the basic tenets of contract law is that in order for a contract to be enforceable, its essential terms must be sufficiently definite to provide a basis for enforcement. Stocktrans, 2007 WL 2317403, at *3 (citing, inter alia, Biddle v. Johnsonbaugh, 664 A.2d 159, 163 (Pa. Super. 1995)). With this precept in mind, the Court turns to the Defendants' contention that the London Memorandum is unenforceable because "several of its terms are ambiguous or indefinite." (Doc. 225 at 33). The Defendants direct the Court's attention to the bullet pointed phrase in the Memorandum: "perpetual and worldwide pertaining to goods of LS registration," arguing that "[t]his fragmentary and incomplete phrasing leaves open the issue of where exactly each party

34

could sell its goods." (Id.). The Defendants argue that the phrase fails to make clear whether AE could sell throughout the world or merely in those locations where Lyle & Scott had registered its marks. (Id. at 34 35). The Plaintiffs respond that "[i]n describing the intended term and geography of the agreement, the parties could not have adopted more clear and unambiguous language than 'perpetual and worldwide.'" (Doc. 233 at 8).

In Pennsylvania, "the paramount goal of contract interpretation is to determine the intent of the parties." Garden State Tanning, Inc. v. Mitchell Mfg. Group, Inc., 273 F.3d 332, 335 (3d Cir. 2001) (citing Meeting House Lane, Ltd. v. Melso, 628 A.2d 854, 857 (Pa. Super. 1993)). The strongest manifestation of that intent is the wording of the agreement itself. Rich Maid Kitchens, Inc. v. Pa. Lumbermens Mut. Ins. Co., 641 F. Supp. 297, 307 (E.D. Pa. 2006). "Normally the language used in a contract will be given its ordinary meaning in the absence of evidence of some special meaning." 8 Pennsylvania Law Encyclopedia § 145 (1971 & Supp.1995).

"'Where the intention of the parties is clear, there is no need to resort to extrinsic aids or evidence.'" Steuart v. McChesney, 444 A.2d 659, 661 (1982) (quoting East Crossroads Ctr., Inc. v. Mellon-Stuart Co., 205 A.2d 865, 866 (1965)). Instead, the meaning of a clear and unequivocal written contract "'must be determined by its contents alone.'" Id. "[W]here language is clear and unambiguous, the focus of interpretation is upon the terms of the agreement as manifestly expressed, rather than as, perhaps, silently intended." Id.

Whether a term of a contract is ambiguous is a question of law. St. Paul Fire and Marine Ins. Co., 935 F.2d at 1431. The law of Pennsylvania presumes that the writing conveys the parties' intent. Consequently, a contract will be found ambiguous only if it is: (1) reasonably or fairly susceptible of different constructions; (2) capable of being understood in more than one

sense; (3) obscure in meaning through indefiniteness of expression; or (4) its words have a double

meaning.  See Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc., 247 F.3d 79, 93 (3d Cir.

2001).  A contract is not ambiguous if the court can determine its meaning absent a guide other

than "knowledge of the simple facts on which, from the nature of the language in general, its

meaning depends; and a contract is not rendered ambiguous by the mere fact that the parties do

not agree on the proper construction."  Id.  "[A]mbiguity in a contract must emanate from the

language used in the contract rather than from one party's subjective perception of its terms."  17A

Am. Jur. 2d Contracts § 331 (2d ed. 2008).  In determining whether or not there is an ambiguity,

"the whole contract must be considered and not an isolated part."  Gerhart v. Henry Disston &

Sons, Inc., 290 F.2d 778, 784 (3d Cir.1961).

The Court of Appeals for the Third Circuit summarized Pennsylvania law governing

alleged contractual ambiguity as follows:

> [A] contract that is unambiguous on its face must be interpreted
> according to the natural meaning of its terms, unless the contract
> contains a latent ambiguity, whereupon extrinsic evidence may
> be admitted to establish the correct interpretation. However, a
> claim of latent ambiguity must be based on a "contractual
> hook": the proffered extrinsic evidence must support an
> alternative meaning of a specific term or terms contained in the
> contract, rather than simply support a general claim that the
> parties meant something other than what the contract says on its
> face. In other words, the ambiguity inquiry must be about the
> parties' "linguistic reference" rather than about their
> expectations. Furthermore, a proffered alternative meaning for
> the contractual hook must be reasonable; that is, it must be
> supported by contractual evidence that goes beyond the party's
> claim that the contractual hook has a certain meaning, and the
> interpretation cannot contradict the standard meaning of a term
> when the parties could have easily used another term to convey
> this contradictory meaning. In determining whether latent
> ambiguity exists in a facially unambiguous contract, a court
> must consider whether the extrinsic evidence that the proponent

of the alternative interpretation seeks to offer is the type of
evidence that could support a reasonable alternative
interpretation of the contract, given the foregoing principles.
Finally, a court can consider an alternative interpretation of a
facially unambiguous term when the plain meaning
interpretation of the contract would lead to an absurd and
unreasonable outcome.

Bohler-Uddeholm America, Inc., 247 F.3d at 96.

The Court finds that the memorandum term "perpetual and worldwide pertaining to goods of L&S registration" is not ambiguous. The clear import of this term is that the co-existence agreement made between AE and L&S was unlimited, encompassing every type of good for which L&S had registered its mark. The Defendants argue that the phrase "pertaining to goods of L&S registration," fails to "answer the question of whether . . . the terms would allow [AE] to sell throughout the world, or merely in locations where [L&S] owns registrations." (Doc. 225 at 35). The Court finds that the Defendants' suggested reading of the the term tortures the words of the Memorandum and, more fundamentally, is unreasonable. L&S fails to explain on what ground it could limit and why AE would agree to limit its right to sell its goods in parts of the world where L&S has no prior claim. It is also impossible to see why L&S would object to AE sales in parts of the world where L&S has no prior claim. Moreover, as the Plaintiffs point out, if L&S had intended to limit AE's right to sell unimpeded in any segment of the market, it knew how to do so, having inserted a provision in the Memorandum excluding AE from selling in the "green grass" or golf market. Under the L&S interpretation of "pertaining to goods of L&S registration," the words "world-wide" are stripped of all meaning. As a result, the Defendants have failed to satisfy the first prong of the test for ambiguity set out in St. Paul Fire and Marine Ins. Corp., 935 F.2d at 1431.

The phrase also fails to satisfy the latent ambiguity criteria set out in <u>Bohler-Uddeholm</u> <u>America, Inc.</u>, 247 F.3d at 96. Even if the Court were to approach this term as though it had some possible latent ambiguity - an argument that the Defendants do not make - allowing it to consider evidence outside the four corners of the Memorandum, the result would be the same. The Defendants urge the Court to find an ambiguity in the Memorandum based on earlier versions of Strohm's notes. Defendants state that "an examination of the terms found in the earlier draft . . . sheds light on the meaning of 'perpetual and worldwide.'" (Doc. 225 at 35). The Defendants' argument is as follows: "[I]n the later version of her notes, Strohm omitted all mention of the parties' discussions with regard to payment of an annual royalty to Lyle & Scott . . . . Construing this ambiguity against [AE], the party seeking enforcement, the Court should find that the geographic scope described in Attorney Strohm's handwritten notes is so indefinite and ambiguous that it cannot be enforced." <u>Id.</u> (citations omitted). The Court is unable to divine - and the Defendants do not explain - how this evidence consider could possibly support its alternative interpretation of the Memorandum term.[13] In any event, the argument violates the rule that "extrinsic evidence cannot be used to create an ambiguity." <u>U.A.W. v. Skinner Engine Co.</u>, 188 F.3d 130, 145 (3d Cir.1999).

### 3. Completeness of the Contract Terms

The Defendants contend next that the terms of the London Memorandum cannot be

---

[13]The Defendants do not allege that any other portion of the London Memorandum is ambiguous. The record shows, though, that in email exchanged after the London meeting, the parties disagreed about the scope of the registration clause set out in the Memorandum. In the interest of complete analysis, the Court finds that this clause, too, is unambiguous, and that Pennsylvania law, as summarized above, does not provide any basis for arguing or concluding that this clause contains a latent ambiguity. Had L&S intended to limit the areas in which AE was permitted to register its mark, it could have done so clearly and explicitly.

enforced as a contract because critical terms are missing. They point out that the Memorandum is not dated, does not contain an effective date, fails to set terms for AE's payment of consideration, and does not contain language agreeing that there was no likelihood of confusion between their respective marks. This argument is essentially a recasting of the Defendants' earlier argument - already rejected by the Court - that the more complete nature of the formal document negates contractual intent with respect to the Memorandum.

Courts generally disfavor the destruction of contracts because of uncertain terms. See In re Pennsylvania Footwear Corp., 204 B.R.165, 175 (Bankr. E.D. Pa. 1997). Thus, "'the courts will, if possible, so construe the contract as to carry into effect the reasonable intention of the parties if that can be ascertained.'" See id. (citing Rossmassler v. Spielberger, 112 A.2d 876, 880 (Pa.1921), (quoting 6 Ruling Case Law 645 (1915)). Under general principles of contract law, and under the law of Pennsylvania, an agreement will be deemed sufficiently definite if its terms provide a reasonably certain basis upon which the court can grant an appropriate remedy. Biddle, 664 A.2d at 163.

Because the Defendants do not identify any material term missing from the London Memorandum which would preclude enforcement, their argument fails.

IV. **REQUEST FOR SANCTIONS BASED ON CONDUCT OF STROHM AND FIORE**

In addition to the arguments evaluated above, the Defendants contend that summary judgment should be denied in order to sanction the Plaintiffs for the improper conduct of Fiore and Strohm. For the reasons that follow, the Court rejects these arguments.

A. **The Alleged Spoliation of Evidence**

The Defendants argue that the Plaintiffs' Motion for Summary should be denied on

spoliation grounds. Because Fiore destroyed notes that he made during the London meeting, the Defendants argue that they are entitled to dismissal of AE's contract claim or, at the very least, a spoliation inference which "in combination with some not insubstantial evidence for the non-movant, is grounds for denial of summary judgment." (Doc. 225 at 8) (citation omitted).

Following the London meeting, AE and L&S entered into negotiations regarding AE's possible purchase of L&S. In order to facilitate those negotiations, L&S provided AE with a number of documents pursuant to a nondisclosure agreement. When negotiations came to naught, AE notified employees possessing relevant information that the L&S documents relating to the purchase negotiations should be destroyed or returned. Upon receipt of this communication, Fiore destroyed notes taken during the London meeting. Destruction of these notes was addressed indirectly in an Opinion and Order of the Special Master Concerning Defendants' Objections to Plaintiffs' Report on Spoliation (Doc.132), and in an Order (Doc. 81) entered by the Court earlier in this litigation. In the Order, Magistrate Judge Caiazza wrote, "[T]here is clear evidence that one of [AE]'s employees went too far and destroyed materials beyond the Due Diligence documents." (Id. at 2).

Whether to impose sanctions for spoliation of evidence lies within the Court's discretion. Paramount Pictures Corp. v. Davis, 234 F.R.D.102, 110 (E.D. Pa. 2005). See also Walters ex rel. Walters v. Gen. Motors Corp., 209 F. Supp. 2d 481, 490 (W.D. Pa. 2002). The Court of Appeals for the Third Circuit has instructed that sanctions are inappropriate unless it appears that there has been actual suppression or withholding of evidence; no unfavorable inference arises unless the spoliation was intentional so as to indicate fraud and a desire to suppress the truth. Gumbs v. Int'l Harvester, Inc., 718 F.2d 88, 96 (3d Cir. 1983) (citations omitted). The Defendants have not

identified and the Court has not found evidence in the record - including in the prior rulings by the Special Master and Magistrate Judge Caiazza - to suggest that Fiore's destruction of his meeting notes was anything other than a careless response to Strohm's instructions pertaining to L&S documents. The facts do not support an inference of fraud or intent to suppress the truth. As a result, the Court will not revisit the spoliation issue.

## B. The Allegations of Unethical Conduct by Strohm

The Court considers last the Defendants' contention that Strohm's violation of the Pennsylvania Rules of Professional Conduct warrants preclusion of the following items of evidence from the record on summary judgment: evidence of Strohm's handwritten notes, the draft agreement, all testimony relating to the London meeting offered by Strohm, Hall and Fiore, and all evidence obtained from Strohm's "numerous and improper contacts with Mr. Hall before, after, and during the London meeting."  (Doc. 225 at 392-93).

According to the Defendants, Strohm violated  Rule 4.2 of the Pennsylvania Rules of Professional Conduct[14] when she attended the London meeting without notifying Hall that she was an attorney, rather than a business person.  They contend that Strohm concealed her status from Hall to gain and exploit a negotiating advantage.  Specifically, the Defendants allege that Strohm crafted the memorandum which the Defendants, perhaps in a slip of the pen, describe as "an unconscionable *settlement*."  (Doc. 225 at 32).  "[T]o compound the damage, she . . . prepared her handwritten notes in consultation with [AE]'s outside trademark lawyer . . . and

---

[14]This Rule reads: "In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so".

[AE]'s general counsel. . . ."  (Id. at 31).

The Defendants' position is meritless. Again, they seek to resurrect a matter decided by the Special Master.  In his Report and Recommendation (Doc. 206), the Special Master found that there was no support for the position that Strohm acted in any legal capacity while participating directly in the London meeting.  (Id. at 4).  Furthermore, in the broader context of communications between L&S and AE in general, the Court does not find any evidence that Strohm sought to conceal that she was an attorney or engaged in duplicity to gain a negotiating advantage.  In fact, it is not clear at all that she had an advantage.  The record certainly does not paint Hall as a naif.  The Defendants argue, and Hall claims in his deposition, that although he knew Strohm's title was "Corporate Counsel," he was  unaware that she was a lawyer.  At the same time, however, he admits that he recognized that her title had "legal advisor connotations." (Doc 227 Ex B. at 164).  Hall did not seem troubled by that fact, and did not question Strohm about her position.  Significantly, Strohm testified, without contradiction in the record, that Hall described *himself* as "educated and trained as an attorney."  (Id. Ex. H at 273).

Finally, and perhaps most importantly, the record fails to show that the Defendants were prejudiced in any way by Strohm's participation in events preceding or during the London meeting.  Ground rules that were established and clearly communicated in advance of that meeting contemplated that Strohm would attend as a member of the AE management team, and that *each side* would have trademark counsel available for consultation during the meeting.  Hall attended the meeting without objecting to the ground rules.  Strohm was justified in assuming that Hall  had counsel available to him, and that the L&S/ HW attorneys were aware and approved of the meeting arrangements.  Because Strohm participated in an October 31, 2005

telephone meeting with Sharpe and the Defendants' attorneys, Anne Roome and Susan Chatterly, these attorneys certainly knew who Strohm was and, presumably, were aware of her professional status. (Doc. 223 at 190). The record does not indicate that the Defendants' attorneys registered any objection to Strohm's participation in settlement negotiations generally or in the London meeting in particular. Strohm had every reason to believe that attorneys for L&S had been notified of the meeting and, in fact, were standing by to aid Hall, just as the AE attorneys were available to her.

The argument that Strohm "gained an unfair advantage over Mr. Hall, a lay person," by speaking with AE's attorneys and then "maximized that advantage by crafting a memorandum," grossly mischaracterizes the record. (Doc. 225 at 31). Strohm did exactly what the meeting ground rules authorized her to do. The record is devoid of evidence showing that Hall was unable to consult or was dissuaded from consulting counsel at any point during the meeting. In addition, the record demonstrates that Hall was an effective negotiator, securing a far more favorable financial arrangement from AE than had been authorized by his superiors. His deposition testimony, as detailed in earlier sections of this Opinion, establishes, too, that it was he who insisted on a written memorandum, was present as it was being drafted, contributed to its wording, was confident that it "fairly captured" what had been discussed, and was ready to sign it. The Court finds absolutely no ground for imposing sanctions, or for further consideration of Strohm's alleged ethical violation.

## V.   <u>CONCLUSION</u>

For the reasons detailed above, the Plaintiffs' Motion for Summary Judgment (Doc. 202) will be granted. Disposition of this Motion resolves all other aspects of this litigation. An

appropriate Order follows.

/s/ *Amy Reynolds Hay*
_____ United States Magistrate Judge

Dated:  26 November, 2008

cc:      All counsel of record by Notice of Electronic Filing

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**


AMERICAN EAGLE OUTFITTERS, INC. and )
RETAIL ROYALTY COMPANY, )
                                    )
         Plaintiffs, )
                                    )
     vs. )      Case No. 2:06-cv-00607-ARH
                                    )
LYLE & SCOTT LIMITED and HARRIS )
WATSON INVESTMENT LIMITED, )
                                    )
         Defendants. )

## JUDGMENT ORDER


        AND NOW, this 26th day of November 2008,

        IT IS HEREBY ORDERED that the Plaintiffs' Motion for Summary Judgment filed

pursuant to Fed. R. Civ. P. 56 is GRANTED, for the reasons set forth in the accompanying

Opinion.

        IT IS FURTHER ORDERED that JUDGMENT is entered, pursuant to Rule 58, Fed.

R.Civ.P., in favor of the Plaintiffs.

        This Order resolves this matter in its entirety.  Therefore, the Clerk is directed to mark

this case closed.


                          */s/ Amy Reynolds Hay*
_____United States Magistrate Judge